**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING DIVISION**

**SUSAN MICHELLE SIBOLE,**

   **Plaintiff,**

**v.**          **CIVIL ACTION NO. : 5:14-CV-03**
             **(JUDGE STAMP)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

   **Defendant.**

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

On January 10, 2014, Plaintiff Susan Michelle Sibole ("Plaintiff"), proceeding *pro se*, filed a Complaint to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1). On March 25, 2014, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 9; Administrative Record, ECF No. 10). On August 29, 2014, and September 29, 2014, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 21; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 22). Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. PROCEDURAL HISTORY

On February 28, 2011, Plaintiff filed her first application under Title II of the Social Security Act for Disability Insurance Benefits ("DIB"). (R. 122). On September 6, 2011, Plaintiff protectively filed her first application under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"). (R. 124, 126). Plaintiff alleged disability that began on June 1, 2010 due to kidney disease, epilepsy, chronic fatigue syndrome, irritable bowel syndrome, osteoporosis and vertigo. (R. 168). The SSI claim was denied on April 6, 2011 because Plaintiff was found not to be eligible for SSI because she failed to file an application. (R. 65). Plaintiff's DIB claim was initially denied on June 1, 2011 (R. 69). Plaintiff's DIB claim was denied again upon reconsideration on August 24, 2011. (R. 75). On September 23, 2011, Plaintiff filed a written request for a hearing (R. 80), which was held before United States Administrative Law Judge ("ALJ") Marc Mates on July 25, 2012 in Charlottesville, VA. (R. 29, 96). Plaintiff, represented by counsel Rodger L. Smith, Esq., appeared and testified, as did Plaintiff's daughter, Michelle Evans. (R. 29). Andrew V. Beale, Ed.D., an impartial vocational expert, also appeared and testified. (R. 29). On September 25, 2012, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 12-23). On November 15, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-4).

## III. BACKGROUND

### A.     Personal History

Plaintiff was born on December 28, 1963, and was forty-seven (47) years old at the time she filed her Social Security applications. (R. at 122, 126). She completed high school plus some college. (R. 35). Plaintiff has prior work experience as office manager, data entry clerk,

convenience store cashier. (R. 145-52). Plaintiff was married on April 30, 1993 to Thomas Evans. (R. 123). At the time of the administrative hearing, Plaintiff had separated from her husband and noted she has a boyfriend, who does not reside with Plaintiff but helps around the house. (R. 45). Plaintiff has two adult children and she shares a home with her daughter and two grandsons. (R. 45, 712).

**B.     Medical Evidence**

**1.   Plaintiff's Self-Report Medical History**

Plaintiff noted that she experienced her first grand mal seizure in the summer of 1977 when she was fifteen (15) years old. (R. 712). Plaintiff was placed on medication but continued to experience seizures and major side effects from the seizures themselves and medication. (Id.). Plaintiff had numerous reproductive issues and her pregnancies in 1982 and 1983 were classified as high-risk. (R. 712). At the age of twenty-two (22), Plaintiff had a complete hysterectomy. (Id.). In 1986, Plaintiff noted she began having breakthrough seizures, which were mainly petit mal. (R. 712). Plaintiff explained that the seizures became worse and were eventually uncontrollable, resulting in her termination from employment at the Postal Service. However, Plaintiff returned to work at the Postal Service and held other minimum wage jobs despite continuing to have seizures, vertigo and migraines. (Id.). Plaintiff resigned from the Postal Service in 1989 because she was unable to work. (Id.). Later that year, Plaintiff's seizures subsided and she returned to work in retail until the end of 1992. (R. 713). In 1993, Plaintiff had a cyst and benign tumor removed from her colon and later in 1993 had an abdominal surgery. (Id.). Between 1993 and 2001, Plaintiff only worked when able and continued to suffer from vertigo, migraines and urinary tract infections. (Id.). Plaintiff began working again in 2001 and reported that with the exception of frequent UTIs and migraines, she was relatively healthy. (Id.).

In 2007, Plaintiff was laid off due to the economy and moved to South Carolina. (Id.).

In 2008, Plaintiff worked for a convenience store and her employer was understanding when Plaintiff had to miss work due to migraines and UTIs. (Id.). In fall of 2009, Plaintiff was diagnosed with kidney stones. (Id.). After having a CT scan, Plaintiff was told she had a "sponge" kidney. (Id.). In 2010, Plaintiff moved back to West Virginia and then eventually Virginia in order to be closer to family to have help. (R. 714). After moving back, Plaintiff was unable to work. (Id.). In sum, Plaintiff explained that she has had good years and bad years. (R. 715). At times, Plaintiff was able to support and care for her children and at other times, her children needed to care for her. (Id.).

### 1. Medical History Pre-Dating Alleged Onset Date of June 1, 2010

Plaintiff reported first experiencing kidney stones in January 2009. (R. 384). Plaintiff had appointments with Dr. Michael D. Pryor, M.D., at the Urology Center of Spartanburg on September 23, 2009 (R. 233), October 7, 2009 (R. 232), November 13, 2009 (R. 231) and March 23, 2010 (R. 230). During these appointments Plaintiff reported back pain, pelvic pain and nausea. She reported passing kidney stones and experiencing frequent UTIs. Plaintiff's diagnoses included history of urolithiasis, medullary nephrocalcinosis, with a question of medullary sponge kidney, hypocitraturia and left pelvic pain.

On September 14, 2009, Plaintiff had a CT scan of her abdomen and pelvis. (R. 244). The CT scan showed no evidence for obstructive uropathy nor medical nephropathy, but did reveal echogenic pyramids, both kidneys, which suggest medullary sponge kidney changes, as well as multiple left renal calculi without obstructive effects. (R. 244-45). On September 17, 2009 (R. 243), September 23, 2009 (R. 242), October 7, 2009 (R. 241) Plaintiff had x-rays taken which showed calcifications in the left upper quadrant, outside of the urinary tract, no definite

significant calcifications of the kidneys, and multiple pelvic calcifications, consistent with phleboliths. An x-ray from March 23, 2010 showed no new calcifications, but noted an upper pole calcification as well as lower pole calcification in the left kidney with multiple phleboliths present, which was unchanged when compared to the October 7, 2009 x-ray. (R. 240).

### 2. Medical History Post-Dating Alleged Onset Date of June 1, 2010

#### a. Waynesboro Hospital

From August 10, 2010 (R. 362) to December 13, 2010 (R. 263), Plaintiff had numerous appointments at Waynesboro Hospital under the primary care of Marjorie Gold, D.O. She was treated for urinary frequency, palpitations and weight loss on August 10 (R. 363-66); headaches, loss of balance, difference in gait, dizziness and vomiting on September 17 (R. 352); pelvic pain and chills on October 6 (R. 344); head and neck problems, dizziness and balance issues on November 1 (R. 286-87); nausea, vomiting and abdominal pain on November 12 (R. 276); pain and nausea on December 1 (R. 269-74); and irritable bowel syndrome on December 13, 2010 (R. 263). During these appointments, physicians noted a medical history of nephrolithiasis, epilepsy and osteoporosis and the physical examinations typically noted abnormalities with Plaintiff's head, eyes, ears, nose or throat, her abdomen (lower tenderness), rectal/genitalia areas and extremities (edema in right leg).

#### b. Pulmonary Consultants

Dr. Gold referred Plaintiff to a pulmonary specialist. On September 24, 2010 and October 1, 2010, Plaintiff presented for a consultation and then follow-up appointment with Dr. Abdul Waheed, M.D. with Pulmonary Consultants following an abnormal CT scan of her chest. (R. 252). Plaintiff's medical history included epilepsy and chronic kidney disease. (<u>Id.</u>). Plaintiff's review of systems and physical exam were normal with the exception of the chief complaint. (R.

252-53). Plaintiff's diagnoses included lung nodules, stable in size and configuration, and chronic obstructive pulmonary disease. (R. 253, 255).

On April 15, 2011, Plaintiff underwent a spirometry test. (R. 519). The testing results were abnormal due to a moderately reduced diffusion capacity, which may represent early interstitial pulmonary disease. (Id.).

On May 9, 2011, Plaintiff presented to the appointment and Dr. Waheed noted Plaintiff's history of kidney problems, chronic kidney disease, epilepsy, dizziness, lung nodules, occasional shortness of breath, coughing and wheezing. (R. 517). Besides for these conditions, Plaintiff's review of systems was normal. (Id.). Plaintiff's physical examination was largely normal. (Id.). Plaintiff's diagnoses were 1) lung nodules, stable in size and configuration; 2) chronic obstructive pulmonary disease; 3) seizure disorder; and 4) restless legs syndrome. (R. 517).

### c. Meadow Kidney Care

Dr. Gold also referred Plaintiff to Dr. Jeremy R. Yospin, M.D. with Meadow Kidney Care. (R. 373-91). Plaintiff had appointments on September 10, 2010 (R. 375-76), October 18, 2010 (R. 374) and November 22, 2010 (R. 373). Plaintiff presented for her nephrolithiasis, medullary sponge kidney, pain in her back, greater on the left than right, constipation and chronic nausea. (R. 376). When asked about her seizure disorder, Plaintiff stated "I cannot even remember when" she had her last seizure. (R. 376). Plaintiff's review of systems and physical examinations were positive for headaches, nausea, constipation, mild tenderness in the back but overall were normal. Plaintiff's diagnoses included nephrolithiasis, with the largest stone approximately three (3) mm; a lung nodule; chronic pain, perhaps attributed to her stones; medullary sponge kidney; and osteoporosis. (R. 373-76).

### d. Potomac Gastroenterology

Dr. Gold referred Plaintiff to Potomac Gastroenterology from September 2010 to December 2010 where Plaintiff was treated by Dr. Fawaz Z. Hakki, M.D. (R. 402-47). At her initial appointment on September 24, 2010, Plaintiff noted fatigue, feeling tired, sleep problems, feeling cold/hot all of the time, depression, anxiety, nervousness, memory loss, confusion, heart fluttering, loss of appetite, nausea, vomiting, constipation, diarrhea, changes in bowel habits, abdominal pain, urinating frequently, pain or burning with urination, leaking urine/incontinence, poor urinary stream, up at night to urinate, headaches, dizziness, joint pain,/welling/stiffness, muscle weakness, muscle pain/cramps, excessive thirst/excessive urination, history of blood transfusion and anemia. (R. 402).

Plaintiff presented to her first appointment for an evaluation of abdominal pain, constipation greater than one year with irregular bowel movements. (R. 440). She also noted discomfort with nausea and vomiting and reported vomiting about five times per week. (Id.). In reviewing Plaintiff's symptoms, Dr. Hakki noted:

> She does report breakthrough of seizures since being put on the generic epileptic medication she is currently on in the last two months without memory of these occurring. However, per patient's account, her PCP feels that the symptoms may be secondary to the frontal lobe abnormality rather than the medication changes.

(R. 441). The physical examination was largely normal but noted a soft abdomen and tenderness in the right lower quadrant, left lower quadrant and left upper quadrant. (R. 441). The impression/plan at this time noted that an EGD was warranted to evaluate Plaintiff's upper GI tract as well as a colonoscopy. (R. 442). The notes specifically mention the need to obtain consent from Plaintiff's neurologist for the procedure "as the patient is having breakthrough seizures," which need to be controlled prior to the procedure. (R. 442). Further laboratory tests were ordered at this time as well as a pulmonology consultation for her splenic granulomatous

changes, unclear etiology. (Id.).

### e. Cumberland Valley Neurosurgical

Plaintiff also received treatment from Dr. Gediminas Gliebus, M.D. with Cumberland Valley Neurosurgical regarding her seizure disorder. (R. 393-94).

On October 25, 2010, Plaintiff reported dizziness, intermittent tremors and loss of balance occurring almost daily and starting about a year prior. (R. 393). Plaintiff stated that the dizziness lasts minutes to an hour, feels as if the room is spinning around her and is associated with nausea and vomiting with no loss of consciousness. (Id.). Plaintiff noted intermittent fast frequency tremors in her upper extremities. (Id.). She also described loss of balance intermittently, at times feeling like she is being pulled. (Id.). These symptoms sometimes occur together, or separately. (Id.). She also reported intermittent numbness in her left upper extremity as well as headaches, which occur several times a week. (Id.).

Dr. Gliebus noted that Plaintiff's brain MRI was fairly unremarkable and showed very minimal cerebral white matter disease, which was nonspecific. (Id.). Plaintiff's medical history included an epilepsy diagnosis since the age of fifteen (15); Plaintiff also described having grand-mal and petit-mal seizures for which she takes Primidone and stated that she "did not have seizures for many years." (Id.). Plaintiff's examination was largely normal. (R. 394). Dr. Gliebus's noted: "I do not think that we are dealing with a demyelinating disease, because of the temporal occurrence of the symptoms in unremarkable brain MRI. I would like the patient to be evaluated by ENT for the vertigo." (Id.). Dr. Gliebus also recommended an evaluation for Plaintiff's intermittent palpitations, an MRA of her head and neck as well as a DEXA scan. (Id.).

At a follow-up appointment on December 17, 2010 Plaintiff noted her vertigo was less frequent at about three times per week, which is still associated with a spinning sensation and

that she is being pulled to the right side along with nausea and vomiting. (R. 395). Plaintiff's neurological examination was non-focal and unchanged since the last visit. (Id.). Plaintiff's diagnosis was intermittent vertigo, rule out benign positional vertigo. (Id.). Dr. Gliebus further noted that if the ENT evaluation comes back negative, "we might be dealing with a vestibular migraine." (Id.). Dr. Gliebus further ruled out demyelinating disease. (Id.).

### f. Mohammad S. Haq, MD, PC

Plaintiff had appointments with Dr. Mohammad Haq, an internist, on August 10, 2010 (R. 503), September 14, 2010 (R. 502), October 1, 2010 (R. 501), January 7, 2011 (R. 499), and January 21, 2011 (R. 498).

On August 10, 2010, Plaintiff reported urinary pain and kidney pain. (R. 503). Plaintiff reported increase in headaches and was without a recent seizure. (Id.). She also reported anxiety, feelings of depression and difficulty sleeping. (Id.). The review of systems also noted increased irregularities with Plaintiff's urinary system. (Id.). Dr. Haq ordered lab work and his assessment included tobacco cessation, migraines, seizures, palpitations and nausea. (Id.).

On September 14, 2010, Plaintiff reported back pain, feeling very tired and very shaky in her right hand and arm, which lasts up to a few minutes and sometimes returns hours later. (R. 502). She reported dizzy spells, with an increase in vertigo and the room spinning, which requires her to lay down. (Id.). She continued to experience headaches, difficulty sleeping and restless legs. (Id.). Dr. Haq's diagnoses were vertigo daily and at night, with loss of balance; headaches; dropping things in her right hand; restless leg; nausea; and back pain. (Id.). Dr. Haq recommended an MRI based on Plaintiff's vertigo and headaches. (Id.).

On October 1, 2010, Plaintiff noted continued difficulties sleeping. (R. 501). Dr. Haq also noted during the physical examination pain in the left pelvis. (Id.). Dr. Haq added chronic fatigue

to his diagnoses and noted that Plaintiff was scheduled to see a neurologist and to undergo an EGD and colonoscopy. (Id.).

On January 21, 2011, Plaintiff presented to an appointment with Dr. Haq for a UTI and no other conditions were addressed at this time. (R. 498).

### g. Panhandle Neurology Center, Inc.

Dr. Khajavi referred Plaintiff to Panhandle Neurology Center for her restless leg syndrome, seizure disorder and vertigo. (R. 595).

On February 23, 2011, Plaintiff had an appointment with Dr. Varga and reported experiencing vertigo since September 2010 about three to four times per week, which she described as "really bad, stumbling into things." (R. 595). She also reported dizziness, spinning, nausea and vomiting. (Id.). Plaintiff stated that she has had both grand mal and complex partial seizures and that her last seizure occurred ten (10) years ago and she has been stable on her Primidone medication. (Id.). Plaintiff also complained of restless leg syndrome. (Id.). Plaintiff's review of systems noted the presence of vertigo, irritable bowel syndrome, kidney disease and stones (sponge kidney), urinary problems, seizures and leg movement in sleep. (R. 596-97). Plaintiff's physical examination was normal. (R. 597). Plaintiff's diagnoses were 1) vertigo, peripheral; 2) migraine headache, stable and controlled with medication; 3) seizure disorder, stable and controlled with medication; and 4) restless leg syndrome v. periodic leg movements of sleep. (Id.).

On March 14, 2011, Plaintiff had an appointment with Dr. Varga. (R. 599). Plaintiff noted continued sleep deprivation and described her vertigo symptoms as "a feeling of stumbling, dizziness, spinning, nauseated and sometimes vomiting." (Id.). Dr. Varga noted that Plaintiff was diagnosed with a seizure disorder at age fifteen (15) after having a grand mal

seizure but that Plaintiff "has been [seizure] free for at least 10 years." (Id.). Plaintiff's EEG report was normal but Dr. Varga noted that the EEG results do not rule out the diagnosis of a seizure disorder. (Id.).

On April 5, 2011, Plaintiff returned for an appointment with Dr. Varga. (R. 601-04). Plaintiff reported that her legs constantly kick at night, despite taking medication; she noted migraine headaches at least one per month; as for her vertigo, Plaintiff stated that her ENT results showed a "migraine aura" that needed management; and in regard to her seizure disorder, Plaintiff reported no seizure activity with her last seizure ten years ago and regular management with Primidone medication. (R. 601). Plaintiff's physical examination was normal (R. 603). Her diagnoses were 1) vertigo, peripheral; 2) migraine headache; 3) seizure disorder, stable and controlled; 4) restless leg syndrome; and 5) osteoporosis. (R. 604).

On April 26, 2011, Plaintiff had a follow-up appointment with Dr. Varga. (R. 605). Plaintiff reported that Requip was "helping a lot" for her restless leg syndrome and the physician noted that the iron studies were normal. (Id.). Plaintiff stated she had migraine headaches four (4) times a week with aura (vertigo). (Id.). Plaintiff still reported no seizure activity. (Id.). The review of systems noted vertigo, irritable bowel syndrome, kidney disease and stones, recurrent UTI, seizures and leg movement in sleep. (R. 607). The physical examination was normal. (Id.). Plaintiff's diagnoses remained unchanged from her prior appointment but the physician did note in regard to Plaintiff's vertigo that there was a normal neurological exam and no schwannoma (i.e., a nerve sheath tumor) on the MRI. (R. 608). As for Plaintiff's seizure disorder, the physician noted that the 2011 EEG was normal and should be repeated up to three more times for increased sensitivity. (Id.).

On May 25, 2011, Plaintiff returned for an appointment and noted that her restless leg

11

syndrome had been controlled with medication and that she was still having migraine auras four times per week with vertigo. (R. 609). In regard to her seizure disorder, Plaintiff stated she woke up and the bottom of her lip was swollen and she was concerned this was due to seizure activity. (Id.). Plaintiff further explained that she did not have urinary incontinence, which typically occurs when she has a seizure. (Id.). The doctor also noted myalgias. (Id.). Plaintiff's physical examination was normal. (R. 610). Plaintiff's diagnoses remained unchanged from her prior visit. (R. 611).

### h. City Urgent Care

On March 16, 2006 (R. 650), November 28, 2006 (R. 649), December 5, 2006 (R. 652), December 18, 2006 (R. 648), April 22, 2007 (R. 647), Plaintiff presented to City Urgent Care for treatment for UTIs and sinusitis.

On February 10, 2011, Plaintiff presented to City Urgent Care with lower abdominal pain, urinary frequency, the chills and reported a UTI approximately one week prior. (R. 646). Plaintiff's review of systems included nausea, abdominal pain, painful frequent and urgent urination, back pain, headache and dizziness. (Id.). Plaintiff was assessed for having a urinary tract infection and the physician noted Plaintiff's history of kidney stones, sponge kidney and frequent UTIs. (Id.).

On March 17, 2011, Plaintiff was treated at City Urgent Care for sinusitis. (R. 645).

On July 12, 2011, Plaintiff presented to City Urgent Care and stated that she had papers to be filled out for Social Security and reported that she had passed a kidney stone on July 9 and still had irritation from it. (R. 643). The review of systems noted tiredness, back pain, headache, weakness and dizziness. (Id.). Dr. Khajavi's notes state the Plaintiff cannot work because of chronic fatigue syndrome, dizziness/vertigo, headaches, and constant back pain. (Id.). Plaintiff's

diagnoses included COPD, lower back pain, fatigue and headaches. (Id.).

On July 26, 2011, Plaintiff presented to City Urgent Care and was treated by Dr. Khajavi. (R. 642). Plaintiff reported ongoing lower back pain that has gotten worse over the last week. (Id.). In the review of systems, Dr. Khajavi noted tiredness, abnormal genitourinary symptoms, back pain and abnormal neurological symptoms. (Id.). The physical examination of Plaintiff's back noted increase tenderness and below average flexion and extension. (R. 642). Plaintiff reported a constant radiation of pain, increased with pending and turning in bed; she rated the pain at a five out of ten and a maximum of eight out of ten. (Id.). Dr. Khajavi prescribed Plaintiff pain medication and recommended that she follow-up with her primary care physician. (Id.).

On November 5, 2011, Plaintiff presented to discuss a referral for a kidney doctor. (R. 644). The review of systems noted tiredness and insomnia. (Id.). Plaintiff reported that Dr. Varga was treating her migraine headaches and she saw an Ear, Nose and Throat (ENT) doctor, Dr. Shahab, and was told her vertigo is most likely part of the migraine. (Id.). Plaintiff was seeking a referral to a nephrologist for her medullary sponge kidney. (Id.).

### i. Dr. Paul Welch, M.D.

On May 24, 2011, Plaintiff presented to an appointment with Dr. Welch after moving to West Virginia from Waynesboro, where she was previously seeing Dr. Yospin for her medullary sponge kidney and recurrent nephrolithiasis. (R. 679). Plaintiff reported that she is prescribed Urocit for her low urinary citrate but she only takes one a day as she forgets to take them. (Id.). Plaintiff described her nephrolithiasis spells as consisting of flank spasm/pain that moves from her lower back around the side into her suprapubic area and then pass, lasting from a few hours to a few days. (Id.). Plaintiff was diagnosed with medullary sponge kidney and nephrolithiasis, recurrent. (Id.). She was directed to change her diet, maintain compliance with Urocit and

attempt to collect more stones. (Id.).

### j. Dr. Nancy Kleinschmidt, M.D.

On August 8, 2011, Plaintiff presented for an appointment seeking to establish care after moving to West Virginia. (R. 669). Dr. Kleinschmidt noted "she is really having no active problems at this time." (Id.). As for Plaintiff's medical history, Dr. Kleinschmidt noted Plaintiff has epilepsy with grand mal seizure activity since age fifteen and that her last seizure was about one month prior, while she was sleeping. (Id.). Plaintiff's review of systems included some weight gain, occasional chills, difficulty with vertigo, occasional palpitations, COPD, asthma, history of nausea, chronic back pain, seizures, vertigo and migraine headaches. (R. 670). Plaintiff's physical examination was normal. (Id.). Plaintiff's diagnoses included 1) seizure disorder, "doing well on Primidone and will need to establish with neurology. We will refer to Dr. Deputy in Harrisonburg;" 2) migraine headaches, doing fairly well with medication and preventative therapy; 3) chronic back pain, prescribed pain medication; 4) osteoporosis, on medication; 5) chronic nausea, etiology unclear; 6) irritable bowel syndrome, constipation predominant; 7) COPD; and 8) restless leg syndrome, doing well on medication. (R. 670-72).

On November 9, 2011, Plaintiff had a follow-up appointment and her diagnoses remained unchanged. (R. 673).

On February 29, 2012, Plaintiff presented to an appointment with chronic constipation, weight gain, dizziness, pain with intercourse, pain urinating, shortness of breath, nausea and vomiting. (R. 701). Plaintiff reported increasing shortness of breath on exertion to the point she cannot climb a flight of stairs. (Id.). She also stated she has been vomiting and feeling nauseated for the past year with recurrent constipation. (Id.). She also reported experiencing sharp electric like pain from her left hip to knee and chronic lower back pain. (Id.). Dr. Kleinschmidt ordered

14

blood work and an upper gastrointestinal series to try to identify the cause of the nausea and vomiting. (Id.).

On April 2, 2012, Plaintiff returned for a follow-up appointment and overall seemed to be improving and she "has had no further seizure activity." (R. 700). Plaintiff's upper GI showed a mucosal irregularity in the distal esophagus consistent with esophagitis. (Id.). Plaintiff's diagnoses were gastroesophageal reflux disease, estrogen replacement therapy topically, headache showing improvement with medication and seizure disorder stable. (Id.).

On June 14, 2012, Plaintiff saw Ms. Carley Jacobs, PA-C at Dr. Kleinschmidt's office for a follow-up appointment and to have her Department of Social Services paperwork completed. (R. 699). Plaintiff stated she was unable to work because of chronic pain, seizures and chronic vertigo. (Id.). Plaintiff reported taking Percocet three times a day to control her pain. (Id.). Plaintiff also requested a referral to a pulmonary specialist in the area due to her COPD and "hardening of the lung." (Id.). Plaintiff's diagnoses included chronic pain, history of migraine headaches, seizure disorder, tobacco abuse and GE reflux disease. (Id.).

On June 21, 2012, Plaintiff had a follow-up appointment and again saw Ms. Jacobs. (R. 698). Plaintiff presented with left ear pain and a sore throat. (Id.). Plaintiff was diagnosed with left otitis externa. (Id.).

### k. Harrisonburg Medical Associates

On December 27, 2011, Plaintiff presented for an appointment at Harrisonburg Medical Associates and reported back problems, fainting/dizziness, indigestion, kidney stones, swollen joints and insomnia. (R. 697).

### l. Woodstock Internal Medicine Specialists, Dr. Deputy

Dr. Kleinschmidt referred Plaintiff to Dr. Glenn E. Deputy, M.D. at Woodstock Internal

Medicine Specialists. (R. 688-95).

On December 27, 2011, Plaintiff presented for a neurological consultation. (R. 691). Plaintiff reported that her seizures are currently well controlled on Primidone. (Id.). Plaintiff reported migraine symptoms on a daily basis including vertigo and nausea. (Id.). She stated the headache is located diffusely, at times over the right temple or over the posterior head regions. (Id.). She also noted neck pain and stiffness. (Id.). Plaintiff also stated that she quit work in May 2010 and was seeking medical disability. (Id.). Dr. Deputy noted that Plaintiff's medical history included epilepsy, sponge kidney, chronic fatigue syndrome, irritable bowel syndrome, COPD, vertigo, migraines, osteoporosis, nausea, chronic back pain and tachycardia. (Id.). The review of systems was positive for back pain, dizziness, indigestion, kidney stones, swollen joints and insomnia. (R. 692). Plaintiff did note some improvement in her pulse and headache syndrome since being placed on propranolol by Dr. Kleinschmidt. (Id.). Plaintiff's physical examination was overall normal. (Id.). Dr. Deputy's assessment referenced the multiple medical problems as outlined above and noted that her seizures were well controlled: "She has only had one petit mal seizure in the last year and no grand mal seizures for several years." (Id.). Dr. Deputy increased Plaintiff's medication, recommended occipital nerve blocks and left cervical paraspinous trigger point injection. (Id.).

On February 7, 2012, Plaintiff returned to the clinic for the placement of occipital nerve blocks and trigger point injections but Plaintiff stated they were not helpful. (R. 688). Despite increase in medications, Plaintiff continued to report persistent headaches, increasing vertigo and hearing loss. (Id.). Dr. Deputy noted that the combination of migrainous vertigo with tinnitus and some hearing loss may indicate Méniére's disease. (Id.). Plaintiff also reported a metallic taste in her mouth, which Dr. Deputy noted can be a seizure aura. (Id.). Dr. Deputy's assessment stated

16

"Multiple medical problems. She has not responded to occipital nerve blocks or trigger point injections. She has not responded to an increase in Propranolol. She may have Méniére's disease. She may have chronic pain." (Id.). Dr. Deputy scheduled the EEG to see if there is evidence of partial complex seizures and increase Plaintiff's medications in regard to her tachycardia and headache prophylaxis. (R. 688-89). Dr. Deputy also recommended that Plaintiff have a consultation at a pain clinic as well as an ENT consult for possible Méniére's disease. (R. 689).

Plaintiff underwent an electroencephalograpy (EEG) on February 23, 2012. (R. 687). Plaintiff's EEG was moderately abnormal because of "crudely sharp dysrhythmic activity in the left and right temporal regions," which was suggestive of a focal convulsive tendency even though no seizure occurred during the recording. (R. 687).

### m. Shenandoah Head and Neck Specialists

Dr. Kleinschmidt referred Plaintiff to Shenandoah Head and Neck Specialists due to her dizziness and tinnitus. (R. 683-86).

On March 29, 2012, Plaintiff presented for an appointment and reported intermittent vertigo and disequilibrium with associated nausea for about two years with vertigo occurring with bending over and lasting up to a couple of minutes as well as constant disequilibrium with any kind of movement. (Id.). She also reported constant migraines as well as occasional ringing in the right ear, lasting a couple minutes at a time. (Id.). Plaintiff's physical examination appeared fairly normal. (R. 684). Plaintiff underwent a Comprehensive Andiometry Threshold Evaluation and Speech Recognition test, which showed "essentially normal hearing bilaterally." (Id.). Plaintiff's diagnoses were impaired hearing and dizziness. (R. 685).

### n. RMH Pulmonary Associates

On August 1, 2012, Plaintiff presented for an appointment for an initial dyspnea

evaluation with Dr. Aklilu M. Degene, M.D. after recently moving to the area and being referred by Dr. Kleinschmidt. (R. 723). Plaintiff reported that she was diagnosed with COPD a year prior in Maryland and was seeking to follow-up in RMH's clinic. (Id.).

Plaintiff explained she was experiencing shortness of breath with activities such as walking up a hill, climbing more than half a flight of stairs or strenuous activity such as lifting or carrying objects and even just talking to people. (Id.). Plaintiff reported an occasional history of a dry cough and bronchitis two times a year, which takes approximately three weeks to improve. (Id.). Plaintiff explained that the dyspnea has persisted since the onset of symptoms three years prior and episodes occur daily and frequently. (R. 725). The dyspnea is relieved by rescue inhalers and rest. (Id.).

Plaintiff's review of symptoms at this time noted fatigue, night sweats, weight gain, hearing loss, snoring, tinnitus, cough, dyspnea, edema of lower extremities, abdominal pain, constipation, dysphagia, heartburn, vomiting, dysuria, frequent urination, hematuria, nocturia, sexual dysfunction, heat intolerance, anxiety, dizziness, gait disturbance, headache, incontinence, insomnia, loss of consciousness, memory impairment, paresthesia, psychiatric symptoms, seizures, tremors, muscle weakness and myalgia. (R. 727-28). Plaintiff's physical examination showed no abnormalities and was largely normal. (R. 728-29).

Dr. Degene ordered a CT of Plaintiff's chest and PFT and diagnosed Plaintiff with chronic obstructive pulmonary disease (COPD). (R. 729).

### o. Laboratory Tests and Procedures

As ordered by the above physicians, Plaintiff underwent numerous laboratory tests, CT scans, MRIs and ultrasounds during this time:

On September 14, 2010, a CT scan of Plaintiff's abdomen and pelvic area showed

multiple left-sided renal calculi and a linear band of scarring or atelectasis at the left lung base as well as a 5.7 mm non-calcified nodule at the left base. (R. 354-61).

On September 14, 2010, Dr. Yospin with Meadow Kidney Care, ordered a CT scan of Plaintiff's abdomen and pelvis. (R. 257). The CT scan revealed three discrete calculi visible in the lower pole of the left kidney with faint calculi suspected in the upper aspect of the left kidney as well. (Id.).This scan also showed a linear band of scarring or atelectasis at the left lung base as well as a non-calcified nodule at the left base as well. (Id.). Plaintiff was diagnosed as having left lower lobe lung nodules. (R. 256).

On September 17, 2010, Plaintiff underwent an MRI of her brain at the request of her primary care physician, Dr. Gold, due to Plaintiff's headaches, loss of balance, right upper extremity weakness, difficulty in gait and daily vomiting. (R. 507). The MRI showed some minimal cerebral white matter disease, a few small punctate foci of increased signal in the peripheral cerebral white matter in the left and frontal lobes. (R. 353). Otherwise, the exam was fairly unremarkable and the brainstem and cerebellum were normal in appearance. (R. 353).

On October 1, 2010, Plaintiff's CT of her chest showed multiple calcified left-sided lung nodules. (R. 250).

On October 6, 2010, Plaintiff's pelvic ultrasound showed the surgical absence of the uterus, the ovaries were not visualized and no abnormal enlarged adnexal mass lesion was seen. (R. 344).

On November 1, 2010, Plaintiff received an MR angiogram of her neck and head, both of which were normal. (R. 291). Plaintiff also received a DEXA bone density test, which found that Plaintiff has osteoporosis and is at an increased risk for fracture in her lumbar spine, neck and hip. (R. 293-94). Due to her palpitations and dizziness, Plaintiff underwent a Holter Monitor,

which was benign. (R. 295).

On November 12, 2010, Plaintiff received an upper endoscopy, which revealed no abnormalities in the esophagus, mild localized inflammation, erythema and edema in the antrum and no abnormalities in the small bowel. (R. 280). Plaintiff also underwent a gastric biopsy at this time, which revealed mucosa of gastric type, interstitial chronic inflammation, moderate, nonspecific. (R. 282).

On December 1, 2010, Plaintiff received an ultrasound of her right upper quadrant, which showed no significant abnormality. (R. 275).

On December 13, 2010, Plaintiff underwent a colonoscopy, which was normal. (R. 263). Her diagnosis was irritable bowel syndrome. (R. 262).

On March 14, 2011, Dr. Varga with Panhandle Neurology Center conducted an EEG. (R. 599). Plaintiff's EEG report was normal. (Id.). Dr. Varga noted "no focal, diffuse or generalized abnormalities were noted. The absence of epiletiform discharges during the EEG recording does not rule out the diagnosis of a seizure disorder." (Id.).

On May 4, 2011, Dr. Waheed with Pulmonary Consultants ordered a CT scan of Plaintiff's chest, which showed a thickening of the base in the left lower lobe, a 1x1 cm nodule in the left base of the lobe and a few calcified mediastinal lymph nodes in the mediastinum were present. (R. 521). The impression was small calcified granuloma in the left lower lobe. (Id.).

On February 23, 2012, Plaintiff underwent an electroencephalography report (EEG) after being referred by Dr. Kleinschmidt and Dr. Deputy. (R. 687). Plaintiff's classification at this time was dysrhythmia grade II, left and right temporal and indications noted the need for an evaluation due to partial complex seizures. (Id.). The report notes:

background consists of mixture of 9 to 10 Hz posterior alpha rhythm and quite

prominent bifrontal maximum beta activity in the 14 Hz range. From the outset one sees fairly abundant crudely sharp discharge maximum in the left and right posterior temporal region, possibly more abundant on the left than the right. Hyperventilation seems to increase this somewhat. She does not reach stage 2 sleep, but does become drowsy. Drowsiness appears to be associated with an increase in these discharges. Some of these come very close to meeting criteria for true sharp discharges. However, the abundant beta activity makes it difficult to be quite certain that these are not examples of superimposed slower and faster activity. Photic stimulation produces a bilateral driving response without producing abnormal discharges.

(Id.). The overall impression of the EEG was moderately abnormal because of "crudely sharp dysrhythmic activity in the left and right temporal regions," which was suggestive of a focal convulsive tendency even though no electrographic seizure occurred during the recording. (Id.).

On March 12, 2012, Plaintiff underwent an upper gastrointestinal series with small bowel series as ordered by Dr. Kleinschmidt due to Plaintiff's nausea, constipation and irritable bowel syndrome. (R. 703). The test revealed numerous granulomas within the spleen, multiple calcifications in the mid to lower pelvis, a small sliding hiatus hernia and a minimal irregularity of the distal esophageal mucosa. (Id.). The overall impression was small sliding hiatus hernia and minimal mucosal irregularity of the distal esophagus, which raised the question of a very mild distal esophagitis. (Id.). Otherwise the GI series was unremarkable. (Id.).

**p. Current Medications**

As of July 17, 2012, Plaintiff's medications included Flexiril (for pain due to kidneys/osteoporosis); Equip (restless leg); Propranool (migraines/heart/shaking); Klonopin (restless leg); Oxycodone (pain due to kidneys/osteoporosis); Phenegran (nausea); Antivert (vertigo); Potassium Citrate ER (kidneys); Primidone (epilepsy); Fosamax (osteoporosis); Zomig (migraines); Albuteral (COPD); multi-vitamin; Miralax (irritable bowel syndrome); Vagifem (hormone replacement); Lexipro (depression); Vimpat (epilepsy) and Prilosec (irritable bowel

syndrome). (R. 222).

### 3. Medical Reports and Opinions

#### a. Physical Residual Functional Capacity Assessment, Medical Consultant, May 27, 2011

Dr. Subhash Gajendragadkar, M.D. completed a physical residual functional capacity assessment of Plaintiff on May 27, 2011. (R. 632-39). As for exertional limitations, Dr. Gajendragadkar stated Plaintiff could occasionally lift fifty (50) pounds, frequently lift twenty-five (25) pounds, can stand and/or walk for a total of about six (6) hours in an eight (8) hour workday, can sit for a total of about six (6) hours in an eight (8) hour workday and can push and/or pull for an unlimited amount of time. (R. 633). For postural limitations, Plaintiff can frequently climb, stoop, kneel, crouch, crawl and can never balance due to her seizure disorder. (R. 634). Plaintiff has no manipulative, visual or communicative limitations. (R. 635). As for environmental limitations, Plaintiff most avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, hazards, such as machinery and heights, and should avoid unsupported heights due to her seizure disorder. (R. 636).

Dr. Gajendragadkar found Plaintiff to be partially credible based on her activities of daily living reported in her adult function report. (R. 637). The consultant noted that Plaintiff's degree of limitation appears inconsistent with exam findings. (Id.). In formulating the assessment, Dr. Gajendragadkar reviewed medical records from Dr. Haq, Potomac Gastroenterology, Pulmonary Consultants and Waynesboro Hospital stemming from September 2010 to May 9, 2011. (R. 639).

This assessment was reviewed by Dr. Rogelio Lim, M.D., who has a specialty in internal medicine, on August 24, 2011 along with new medical evidence from Panhandle Neurology. (R. 653). Dr. Lim noted "neuro intact and seizure stable. no change in the rfc." (Id.). Dr. Lim

affirmed the previous RFC as written with a specific precaution against hazardous jobs, such as no unprotected heights, no ropes, no ladders and no scaffolds. (Id.).

### b. Medical Evaluation, Dr. Mehran Khajavi, July 12, 2011.

Dr. Mehran Khajavi, M.D., who treated Plaintiff at City Urgent Care, completed a Medical Evaluation Form on July 12, 2011. (R. 640-41). Dr. Khajavi noted that Plaintiff's limitation or need for modification was likely to last for twelve months. (R. 640). Plaintiff's physical limitations included lifting, pulling, pushing, lifting greater than ten (10) pounds, climbing and standing for longer than ten (10) minutes. (R. 641). Dr. Khajavi further recommended that Plaintiff apply for SSI or SSDI at this time. (R. 641). Plaintiff's primary diagnoses were convulsion disorder, migraine headaches, vertigo, frequent kidney stone and medullary sponge kidney disorder. (Id.). Her secondary diagnoses were chronic fatigue, back pain, COPD and interstitial pulmonary disorder. (Id.).Dr. Khajavi further noted that Plaintiff was complying with medications and treatment. (Id.).

### c. Medical Evaluation, Carley Jacobs, PA-C, June 14, 2012

Ms. Jacobs worked with Dr. Kleinschmidt who began treating Plaintiff when she first moved to West Virginia in August 2011. Ms. Jacobs completed a Medical Evaluation Form on June 14, 2012. (R. 677-78). She noted that Plaintiff's limitations were likely to last twelve (12) months. (R. 677). Plaintiff's physical limitations were listed as dizziness, chronic pain and seizure activity. (R. 678). She recommended that Plaintiff apply for disability benefits. (Id.). Plaintiff's primary diagnoses were epilepsy and medullary sponge kidney with secondary diagnoses of chronic fatigue syndrome, migraines, COPD and chronic vertigo. (Id.).

### d. Letter to Plaintiff's Attorney from Dr. Glenn Deputy, M.D., June 25, 2012

On June 25, 2012, Dr. Deputy, who treated Plaintiff at Woodstock Internal Medicine Specialists, wrote a letter to Plaintiff's attorney, Rodger L. Smith regarding his evaluation, treatment and diagnosis of Plaintiff. (R. 733). Dr. Deputy opined that Plaintiff met a listing for an impairment under Section 11.00 Neurological. (Id.). In support of this opinion, Dr. Deputy stated:

> She has been diagnosed with intractable generalized epilepsy that is idiopathic. Her first seizure occurred in adolescence and she has a chronic history of absence seizures and tonic-clonic seizures. She has failed four anti-epileptics to induce Primidone, Mysoline, Dilantin and Tegretol. Currently taking Vimpat but with continued seizures. Seizures are at least three a month that she is aware of on average. She is compliant with medication. Due to her chronic history of intractable epilepsy she is not able to drive or maintain employment and therefore, we would state she meets criteria for disability. She continues to suffer from vertigo as well.

(Id.). This letter was not previously provided to the ALJ but was submitted to the Appeals Council and subsequently incorporated into the record.

## C.    Testimonial Evidence

At the ALJ hearing held on July 25, 2012, Plaintiff testified that she currently lives with her daughter and two grandsons. (R. 42). Plaintiff testified that she gradated from high school and started her second year of college. (R. 35). In regard to work experience, Plaintiff's last worked as a cashier for a convenience store. (R. 35).

Plaintiff further testified regarding her impairments and medications. Plaintiff stated she experiences migraine headaches almost daily with pain that lasts anywhere from one to seven days. (R. 37). Plaintiff explained that she also experiences aura migraine, which is without pain but results in sensitivity to light, sound and movement. (R. 37). Plaintiff is on prescription medications for the migraines, which help but do not resolve the headaches completely. (R. 37). Plaintiff must lie down in a dark room with no sound for relief. (R. 37). Plaintiff also has COPD

24

and pulmonary fibrosis, which make it harder for her to breathe in certain conditions, particularly in the heat, in dust or fumes. (R. 38).

Plaintiff further testified regarding her epilepsy. (R. 38). Plaintiff explained that she has petit mal seizures about once every three days. (R. 39). Plaintiff explained that if she has a petit mal seizure, she stares off into space, she does not normally fall and when she comes out of it, she will experience a migraine and need to lie down for about two to three hours. (R. 45). She stated she is experiencing an increase in complex partial seizures, which she has about once every other day. (Id.). Plaintiff typically experiences these seizures during the day. (Id.). Plaintiff explained that these seizures cause confusion because she will be alert and then suddenly not; these seizures often cause her to become very dizzy and often fall. (R. 46). Plaintiff testified she has a grand mal seizure about once a week, typically in her sleep. (Id.). Plaintiff explained that these seizures typically have warning signs and result in shaking and losing body functions. (R. 47). When Plaintiff has these seizures at night, she typically wakes up with a migraine, completely worn out and will have chewed the inside of her mouth and tongue. (R. 48). Plaintiff testified that her seizures have gotten worse since completing the seizure questionnaire, in which she stated her medication kept things under partial control. (Id.). Plaintiff further explained that "over the last several months they've gotten worse." (Id.). She stated that an EEG previously showed the abnormality that was causing the seizures to be in her right temporal lobe but now the abnormality was in both lobes. (Id.). She explained she was seeing a seizure specialist. (Id.).

Plaintiff testified that she also experiences vertigo on a daily basis. (R. 40). Plaintiff stated she takes prescription medication, which "helps to a degree" but that the medication makes her very drowsy. (R. 41). Plaintiff testified that she will just fall over and become very nauseous. (R. 49). Plaintiff stated she must lie down when experiencing vertigo, sometimes from

one to four hours throughout the day. (R. 40).

In regard to her other conditions, Plaintiff testified that she has restless leg syndrome, for which she takes medication (R. 39-40). Plaintiff also has kidney disease and has to urinate frequently, mainly at night. (R. 36). Her additional conditions include a sponge kidney, chronic fatigue syndrome, irritable bowel syndrome, COPD, osteoporosis, rapid pulse, chronic back pain and nausea. (R. 50). Plaintiff further testified that she takes sixteen (16) different medications in order to address her medical conditions. (R. 51). She stated she experiences side effects from the medications, including feeling dizzy, drowsy, tired and nauseous. (R. 51-52).

Plaintiff further testified regarding her daily activities. Plaintiff stated that she has her driver's license but she only drives occasionally. (R. 35). She testified that she does not do any household cleaning. (R. 38). As for her personal care, Plaintiff testified that she only showers if her daughter is home because she has fallen before and is afraid of falling. (R. 43). In regard to her daily routine, Plaintiff stated she wakes up, gets dressed and goes down stairs and then stays downstairs for the rest of the day. (R. 44). Plaintiff makes coffee, sits on the couch, does laundry, rests and maybe walks outside. (Id.). Plaintiff explained that she does some chores, like washing dishes, but does not scrub floors or the bathtub because of balance. (Id.). Plaintiff stated that her daughter cleans the house. (R. 54). Plaintiff testified that she goes grocery shopping with her daughter about once a week and that her daughter does the driving. (R. 44). As for her social activities, Plaintiff explained that her neighbors come to check on her when her daughter is not home and her boyfriend occasionally stays the night perhaps two nights a week. (R. 45). Plaintiff testified that she gets very dizzy in hot temperatures and that the heat can actually cause her to have a seizure. (R. 53).

In regard to her abilities, Plaintiff testified that she is able to walk short distances on level

ground for about fifteen minutes before she tires. (R. 41). Plaintiff stated she can stand for about ten to fifteen minutes, sit comfortably for about fifteen to twenty minutes, she is able to bend over squatting with her knees but tends to lose her balance, she has no problems with her hands and she can lift no more than ten pounds. (R. 41-42). Plaintiff stated she completely falls down about once every other day after losing her balance. (R. 43). Plaintiff testified that someone is with her approximately ninety (90) percent of the time and that her neighbors even keep a key to the house. (R. 53). Plaintiff further testified that she cannot live alone with all of her conditions. (R. 54). Plaintiff's attorney asked that due to Plaintiff's problems sleeping, her migraines, breathing disorder, seizures, vertigo and side effects from medication, how many hours from 8:00 a.m. to 5:00 p.m. Plaintiff normally spends laying down. (R. 54). Plaintiff testified that she normally spends five to six hours out of the day laying down. (R. 55).

**D.     Third Party Testimony**

Plaintiff's daughter, Michelle Nicole Evans, also testified at the administrative hearing. (R. 55). Ms. Evans testified that she has been living with her mother over the past year. (R. 56). She explained that "my mom just kept getting worse and worse to where…the boys would help out the best they could but she really needed me there." (R. 56). Prior to moving in, Ms. Evans regularly visited and helped her mother, including staying on weekends. (R. 56). Ms. Evans testified that "she tries to do stuff. And I don't think she likes to admit that she can't." (R. 56). Ms. Evans explained that her mother attempts to do normal chores but she can't and needs to sit down. (R. 57). Ms. Evans stated that her mother would be bouncing off the walls or stumbling around the yard and she wouldn't know if she was having a seizure or vertigo. (R. 57). She further stated that her mother "wouldn't last" for fifteen minutes in the heat. (R. 57).

Ms. Evans testified that during the day she sees her mother having a seizure or vertigo

attack "a lot." (R. 57). Ms. Evans explained that she sees her stumbling around the house and "she scares me when she's up walking around." (R. 57. 58). Ms. Evans testified that her mother typically lays down for around five hours out of the day. (R. 57). Ms. Evans also explained that her mother will be in the bathroom for a long time trying to urinate. (R. 57). In regard to the side effects of Plaintiff's medications, Ms. Evans also said her mother is extremely tired and drowsy during the day. (R. 57). Ms. Evans stated that Plaintiff no longer drives. (R. 58).

E.      **Vocational Evidence**

Also testifying at the hearing was Andrew V. Beale, Ed.D., a vocational expert. Mr. Beale characterized Plaintiff's past work as a convenience store cashier as unskilled and light; a construction coordinator as skilled and light; a vending machine servicer as semi-skilled and medium; a receptionist as semi-skilled and sedentary; a liquor store clerk as semi-skilled and heavy, but performed as light as described by Plaintiff; data entry clerk as semi-skilled and sedentary; and an office manager as sedentary and skilled. (R. 59). With regards to Plaintiff's ability to return to her prior work, Mr. Beale gave the following responses to the ALJ's hypothetical:

> Q:      For the purposes of the first hypothetical I ask you to assume someone Ms. Sibole's age, education and work experience. And if I asked you to assume that this person is limited to light work as it's defined in the regulations and rulings, that involves no ladder, rope or scaffold climbing, other postural activities on an occasional basis, no concentrated exposure to temperature extremes, odors, fumes, dust, gases, poor ventilation or hazards, would such an individual be able to perform any of Ms. Sibole's past work?

> A:      Well, yes, sir. I think such an individual could do the work as an office manager, do the work as a data entry clerk and could also – well, and the receptionist work that she did and the work as a cashier – the convenience store cashier.

> Q:      And your description of these jobs, was it consistent with the information

found in the Dictionary of Occupational Titles?

A:      Yes, Your Honor.

(R. 59). Next, the ALJ questioned Mr. Beale about Plaintiff's ability to work if she is

completely credible as to the severity of her conditions:

> Q:      All right. For the purposes of the next hypothetical if I asked you to assume someone of Ms. Sibole's age, education and work experience, and if I asked you to assume the full credibility of the allegations to which she's testified today, including her allegations with regard to her episodes of vertigo on a daily basis that require her to lie down, her episodes of seizure, as well and the need to lie down after those, some of which may require her to lie down for an entire day – her migraines – and that the symptoms from her impairments would interfere with concentration, pace and task persistence more than two days a month what would be the impact?
>
> A:      I think that would preclude competitive employment at any skill or exertional level because of the inability to do the sustained type of activity that competitive employment is going to require, essentially, eight hours a day, five days a week, missing no more than a day-and-a-half a month.

(R. 59-61). Plaintiff's attorney chose not to question Mr. Beale when provided the opportunity to

do so. (R. 61).

**F.**     **Report of Contact Forms**

On June 1, 2011, Kimberly Wilfong completed a report of contact form, which states that

Plaintiff is limited to a medium exertional level with environmental restrictions. (R. 177). Ms.

Wilfong found that Plaintiff is able to return to past work as a construction coordinator. On

August 24, 2011, Daniel J. Martin filed a report of contact form agreeing with Ms. Wilfong's

vocational analysis. (R. 195).

**G.**     **Lifestyle Evidence**

On April 13, 2011, Plaintiff completed an Adult Function Report. (R. 159-66). Plaintiff

noted that she cannot sit or stand for very long due to pain and dizziness. (R. 159). Plaintiff reported having difficulty remembering, getting tire very easily, having no energy and needing to take frequent rests or naps. (Id.). As for her daily activities, Plaintiff noted that she gets her grandsons ready for school, drives them to school, goes home and rests, makes beds, conducts light cleaning, rests or naps, picks up the boys from school, rests, prepares supper, rests and then goes to bed. (R. 160). Plaintiff stated she cares for her grandsons and pets but on "real bad days" she receive helps with the boys, driving and feeding. (Id.). Plaintiff reported that she prepares simple meals, performs light cleaning, makes the beds and does laundry but she receives help from the oldest grandson. (R. 161). Plaintiff does not do any yard work. (Id.). Plaintiff noted that she is able to drive a car, she does shopping for food about two to three times a week. (R. 162). Plaintiff's hobbies and interests including reading, gardening and watching television but she is no longer doing any gardening. (R. 163). As for social activities, Plaintiff talks to friends and family daily and goes to the grocery store, drives to school and attends doctor appointments. However, Plaintiff noted that she sometimes needs someone to accompany her. (Id.). Plaintiff does not attend any social groups because she cannot "commit to anything because everything is based on my health daily." (Id.). In regard to her abilities, Plaintiff noted that her conditions affect her ability to lift, bend, stand, walk, sit, kneel, climb stairs, her memory, ability to complete tasks, concentration, understanding, following instructions and using her hands. (R. 164). (Id.). Plaintiff reported that she could walk for about 100 feet before needing to stop and rest for about five to ten minutes before resuming walking. (Id.). In addition, Plaintiff noted that all of her medications have side effects. (R. 166).

On June 27, 2011, Plaintiff described her daily activities in a Disability Report Form. (R.

178-84). Plaintiff explained that she is able to care for her personal needs but must move slowly and rest often. (R. 182). She cannot walk or sit for more than a few minutes without chronic pain. (Id.). Plaintiff stated that cleaning the house, preparing meals and performing normal activities "completely wear me out and I have to lie down." (Id.). Plaintiff reported that she can no longer participate in any activities outside of the house. (Id.). Her osteoporosis prevents her from bending, walking distances and sitting for long periods of time. (Id.).The vertigo causes her to lose balance and become dizzy, which requires her to lay down. (Id.). Plaintiff's chronic fatigue and chronic pain require her to rest frequently throughout the day. (Id.). Plaintiff also states that she cannot stand for prolonged periods of time. (Id.).

On July 14, 2011, Plaintiff completed a second Adult Function Report. (R. 187-94). Plaintiff reported very similar symptoms, daily activities and limitations as described in her first Adult Function Report. Plaintiff explained that she is unable to sit, stand or walk for long, most constantly change positions and must nap. (R. 187). She stated that she is in constant pain, has frequent migraines, loses her balance, is often dizzy, passes kidney stones about twice a week, loses concentration and has memory loss. (Id.). Plaintiff reported caring for her grandsons but also noted that her grandsons help her lift, do laundry, clean, take care of beds and do yard work. (R. 188). While Plaintiff prepares meals daily, she prepares easy dinners because she cannot stand at the stove to cook. (R. 189). Plaintiff conducts household chores such as light cleaning, laundry, making beds and dusting but she can only work at one task for about fifteen (15) minutes then must rest. (Id.). If any work requires lifting, vacuuming or scrubbing, Plaintiff's grandsons help her. (Id.). Plaintiff noted that her social activities are now limited to those involving her grandsons, such as going to her grandson's baseball games or school programs. (R.

191-92). Plaintiff stated that if she is having a particularly bad day, she relies on a friend or relative to go with her and drive. (R. 191). Similar to her first report, Plaintiff noted numerous physical limitations as well as limitations in her mental abilities, such as concentration, memory and following instructions. (R. 192). In conclusion, Plaintiff noted "between the pain, migraines, kidney stones, breathing difficulties and always being tired, I cannot work." (R. 194)

## IV. THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. *Id.*

## V.  ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. **The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.**

2. **The claimant has not engaged in substantial gainful activity since June 1, 2010, the alleged onset date (20 CFR 404.1571 *et. seq.,* 20 CFR 416.971 *et seq.*).**

3. **The claimant has had the following severe impairments: chronic obstructive pulmonary disease (COPD), gastroesophageal reflux disease (GERD), kidney disease, and seizure disorder (20 CFR 404.1520(c) and 416.920(c)).**

4. **The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

5. **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant is limited to no more than occasional ramp/stair climbing**

and no ladder/rope/scaffold climbing. The claimant may occasionally balance, stoop, kneel, crouch, and crawl, but needs to avoid concentrated exposure to temperature extremes, fumes, odors, dust, gases, poor ventilation and hazards.

6.    The claimant is capable of performing past relevant work as an office manager, data entry clerk, and convenience store cashier. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2010 through the date of this decision (20 CFR 404.1520(f) and 416.920(f).

(R. 14-22).

## VI.   DISCUSSION

### A.    Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the

evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.       Contention of the Parties**

Plaintiff's Motion for Summary Judgment primarily includes medical records, some previously incorporated in the record as well as then new records from 2014. (Pl.'s Mot. for Summ. J. and Mem. in Supp. ("Pl.'s Mem.") at 1-62, ECF No. 21). While Plaintiff does not outline specific issues in her Motion, in her Complaint she states that the Appeals Council did not have or consider evidence from her current neurologist, Dr. Paul Lyons, who clearly stated Plaintiff cannot work. (Complaint at 2, ECF No. 1).

Defendant, in her motion for summary judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1, ECF No. 22). Defendant noted that "it is not entirely clear from Plaintiff's Motion for Summary Judgment and Memorandum in Support what exceptions she has to the ALJ's September 25, 2012 decision" but "the Commissioner respectfully asserts that Plaintiff's appeal does not provide a basis for remand or reversal." (Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 11, ECF No. 23). Specifically, Defendant alleges that Plaintiff did not meet her burden of proof that she is disabled; Plaintiff's claim for disability is not fully credible; and remand is not warranted to consider new and material evidence. (Def.'s Br. at 10-15).

**C.    Analysis of the Administrative Law Judge's Decision**

Plaintiff, proceeding *pro se*, did not outline specific allegations in her Motion for Summary Judgment. (Pl.'s Mot., ECF No. 21). However, as a *pro se* litigant, Plaintiff is entitled to a liberal construction of her pleadings. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972); see also Miller v. Barnhart, 64 F. App'x 858, 859 (4th Cir. 2003). Because Plaintiff is proceeding *pro se*, I have carefully reviewed the ALJ's opinion and the entire record. See Elam v. Barnhart, 386 F.Supp.2d 746, 753 (E.D. Tex. 2005) (outlining an analytical framework for judicial review of a *pro se* action challenging an adverse administrative decision, which includes: (1) examining whether the Commissioner's decision generally comports with regulations, (2) reviewing the ALJ's critical findings for compliance with the law, and (3) determining from the evidentiary record whether substantial evidence supports the ALJ's findings); see also Holland v. Comm'r, Soc. Sec. Admin., No. CIV. SAG-13-2648, 2014 WL 2514802, at *1 (D. Md. June 3, 2014) (applying the Elam framework).

After careful review of the ALJ's decision and record, I find that the Commissioner correctly applied the five step sequential evaluation process. Second, the ALJ correctly applied the law at each step of the sequential evaluation process. Third, for the reasons described below, substantial evidence supports the ALJ's decision that Plaintiff was not disabled.

**1.   Step One, Substantial Gainful Activity**

The ALJ ruled in Plaintiff's favor at step one, finding that she had not engaged in substantial gainful activity since June 1, 2010, her alleged onset date. (R. 14). Thus, the ALJ correctly proceeded to step two of the sequential evaluation process.

**2.   Step Two, Severe Impairments**

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 C.F.R. 404.1520(c) and 404.920(c). An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. § 404.1520(c). Any impairment must result from abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1508. Unless the impairment will result in death, it must have lasted or be expected to last for a continuous period of at least 12 months. 20 C.F.R. § 404.1509. "[A]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984). Here, the ALJ found that Plaintiff's severe impairments included COPD, GERD, kidney disease and seizure disorder. (R. 14). Based on the ALJ's lengthy discussion of the medical evidence in his decision and the undersigned's review of objective medical evidence of record, the undersigned finds that substantial evidence supports the ALJ's findings at step two of the sequential evaluation process and there was no legal error.

### 3. Step Three, Listing Impairments and Residual Functional Capacity

#### a. The Listings

At step three, the ALJ must determine whether the claimant's impairment or combination of impairments is so severe that it meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant bears the burden of demonstrating that

his impairment meets or medically equals a listed impairment. See Kellough v. Heckler, 785

F.2d 1147, 1152 (4th Cir. 1986). As the Supreme Court has stated:

> The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity." . . . The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

Sullivan v. Zebley, 493 U.S. 521, 532 (1990) (internal citations omitted). When evaluating

whether a claimant meets one or more of the listed impairments, the ALJ must identify the

relevant listings and then compare each of the listed criteria to the evidence of the claimant's

symptoms. Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). This analysis "requires an

ALJ to compare the plaintiff's actual symptoms to the requirements of any relevant listed

impairments in more than a "summary way." Id. at 1173.

In the present case, the ALJ considered whether Plaintiff met listing 3.02 for COPD, 5.00

for GERD, 6.00 for genitourinary impairments and 11.02 and 11.03 for seizure disorders. (R.

15). The ALJ outlined each listing and noted that the evidence of record does not establish that

Plaintiff meets any of the listings. (R. 15). In his decision, the ALJ provided a detailed and

thorough review of the objective medical evidence related to Plaintiff's diagnoses of COPD,

GERD, kidney disease and seizure disorder. (R. 17-22). The ALJ further noted that the findings

of State agency medical consultants, who also reviewed the evidence of record, similarly found

that Plaintiff does not suffer from impairments accompanied by signs reflective of listing level

severity. (R. 16). The undersigned thoroughly reviewed the medical evidence of record and finds that substantial evidence supports the ALJ's finding that Plaintiff's impairments or combination of impairments do not meet or medically equal the severity of one of the listed impairments.

### b. Residual Functional Capacity

Before proceeding to step four, the ALJ must determine the claimant's residual functional capacity. 20 C.F.R. § 404.1520(e) and 416.920(e). Under the regulations, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. § 404.1545(a)(1). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record. 20 C.F.R. §§ 404.1545(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Even though the Administration is responsible for assessing the RFC, the claimant has the burden of proving her RFC. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983)) (explaining that the claimant has the burden of production and proof through the fourth step of the sequential analysis); see also 20 C.F.R. § 404.1545(a)(3) (stating that the claimant is responsible for providing evidence to be used to develop RFC).

In the present case, the ALJ found that Plaintiff has the residual functional capacity to:

perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant is limited to no more than occasional ramp/stair climbing and no ladder/rope/scaffold climbing. The claimant may occasionally balance, stoop, kneel, crouch, and crawl, but needs to avoid concentrated exposure to temperature extremes, fumes, odors, dust, gases, poor ventilation and hazards.

(R. 16). The regulations define "light work" as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

In support of this RFC, the ALJ provided a thorough and detailed assessment of Plaintiff's medical conditions, symptoms and treatment. (R. 16-22). The ALJ found Plaintiff lacked credibility and provided a detailed analysis explaining this finding. (R. 21). In addition, the ALJ properly considered and weighed opinion evidence from the State agency medical consultants and Plaintiff's treating sources. (R. 21-22).

### i. Credibility Determination

The determination of whether a person is disabled by pain or other symptoms is a two-step process. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of her subjective

allegations of pain in light of the entire record. *Id.*

Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

> 1) The individual's daily activities; 2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and, 7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984).

In the present case, the ALJ considered the medical evidence in the record and found that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 17). The ALJ provided a detailed outline of Plaintiff's medical records, including treatment by her primary care doctors and specialists as well as objective medical testing, such as x-rays, CT scans and MRIs. (R. 17-22). However, the ALJ found that "the claimant's statements (and her daughter' statements) concerning the intensity, persistence, and

41

limiting effects of these symptoms are credible only to the extent that they are consistent with the above residual functional capacity assessment." (R. 17).

In support of this credibility assessment, the ALJ considered Plaintiff's statements regarding her conditions, limitations and activities of daily living based on her testimony at the administrative hearing as well as her Adult Function Reports. (R. 16, 21). The ALJ also considered the testimony of Plaintiff's daughter from the administrative hearing. (R. 17). The ALJ concluded that "the degree of severity alleged lacks support and consistency with other evidence of record" (R. 20) and that "the frequency and intensity of symptoms alleged at the hearing also seem at odds with the claimant's reports to treating and examining sources of record (R. 21). For example, the ALJ cited to the record where Plaintiff reported to her physicians that she had not had a seizure for the past ten years, her seizures were under control with medication and she only had "intermittent" vertigo. (R. 21). This information reported to physicians was inconsistent with Plaintiff's own statements that "she has seizures every three days, migraine headaches every 1-7 days (lasting a few hours at a time), and daily vertigo. (R. 20). The ALJ noted that "[a]though inconsistent information provided by a claimant may not be the result of a conscious intention to mislead, such inconsistencies suggest that the information provided by the claimant may not be entirely reliable." (R. 21). Furthermore, the ALJ reasoned that Plaintiff "has received generally conservative treatment for her conditions. She has been treated primarily with medications, which appear to have been relatively effective." (R. 21). Based on this thorough and well-reasoned analysis, the undersigned finds that the ALJ did not err in making his credibility determination and substantial evidence supports the ALJ's finding that Plaintiff was not fully credible.

### ii.    Opinion Evidence

The ALJ also properly reviewed opinion evidence pursuant to the requirements of 20 C.F.R. §§ 404.1527(c) and 416.972(c), which state: "[r]egardless of its source, we will evaluate **every** medical opinion we receive." (emphasis added). As the Fourth Circuit has stated, a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Although a treating physician's opinion is not binding on the Commissioner, "a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). Therefore, "[t]he treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence.'" See Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006) (quoting Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

When an ALJ does not give a treating source opinion controlling weight and determines that the Claimant is not disabled, the ALJ may assign a lesser weight to the opinion but:

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. This explanation may be brief.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). The following factors are used to determine the weight given to the opinion: 1) length of the treatment relationship and the frequency of examination, 2) the nature and extent of the treatment relationship, 3) the supportability of the opinion, 4) the consistency of the opinion with the record, 5) the degree of specialization of the

physician, and 6) any other factors which may be relevant, including understanding of the disability programs and their evidentiary requirements. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. See Pinson v. McMahon, No. 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each one).

In the present case the ALJ considered the opinion evidence from State agency medical consults and Plaintiff's treating sources, physician assistant Carley Jacobs, PA-C and Dr. Mehran Kajavi, M.D. (R. 21-22). The State agency medical consults opined that Plaintiff could perform medium work involving no ladder/rope/scaffold climbing and no concentrated exposure to extreme cold, fumes, odors, dust, gases, poor ventilation, or hazards. (R. 21; see also R. 632-39, 653). In assigning the opinions "partial weight," the ALJ explained that:

> [w]hile these consultants are not examining doctors, they are experts in all phases of disability evaluation and are well qualified to render an opinion regarding the nature and severity of the claimant's impairments. Their conclusions of functioning are found to be generally consistent with and supported by other evidence of record, including treatment notes and diagnostic test results, and have been afforded partial weight in consequence.

(R. 21). The ALJ then stated that in giving Plaintiff the maximum benefit, he further limited her to light work with additional postural and environmental limitations. (Id.).

Physician assistant Carley Jabobs, PA-C completed a June 2012 Medical Evaluation form, which opined that Plaintiff was precluded from all employment due to her dizziness, chronic pain and seizure activity. (R. 22, see also R. 677-78). In assigning her opinion "little

weight," the ALJ found that "[t]he limitations specified by Ms. Jacobs appear to be somewhat extreme and are not consistent with the weight of the evidence of record, including Ms. Jacob's own treatment notes." (R. 22). The ALJ further explained that "[i]t appears that Ms. Jacobs was involved in the claimant's care on a limited basis, and the form gives undue credence to the claimant's subjective allegations." (Id.). In conclusion, the ALJ found "[b]ecause the form is inadequately supported and inconsistent with the weight of the evidence of record, including treatment notes, the undersigned gives it little weight." (Id.).

Plaintiff's treating physician, Dr. Khajavi also completed a Medical Evaluation form on July 2011, which similarly found that Plaintiff was precluded from all employment and had limitations including lifting, pulling, pushing, lifting greater than ten pounds, climbing and standing for longer than ten minutes. (R. 22; R. 641). In assigning this opinion "little weight," the ALJ reasoned that "[w]hile the record reflects that the claimant visited Dr. Khajavi on five occasions in 2011, the doctor's treatment notes do not show significant findings on physical examination (Ex. 15F/1-5). The undersigned finds that the July 2011 summary assessment from Dr. Khajavi, which provides little explanation for its conclusions, merits little weight." (R. 22).

In assigning lesser weight to Plaintiff's treating source physicians, the ALJ must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. This explanation may be brief." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Here, the ALJ explained that Ms. Jacobs's findings were not consistent with the evidence of record, her treatment of Plaintiff was fairly limited and she gave undue credence to Plaintiff's subjective allegations. (R. 22). Similarly, Dr. Khajavi's opinion was entitled to little weight because she only treated Plaintiff on

five occasions in 2011, her notes fail to show any significant findings on physical examination and she provided little explanation for her conclusions. (R. 22). The undersigned finds that the ALJ sufficiently outlined his reasoning for assigning lesser weight to Ms. Jacobs and Dr. Khajavi's opinions.

Based on the ALJ's detailed RFC analysis, including his credibility determination and treatment of opinion evidence, the undersigned finds that the ALJ did not err when he determined that Plaintiff could perform light work with postural and environmental limitations and that substantial evidence supports the ALJ's finding.

### 4. Step Four, Perform Past Relevant Work

At step four, the ALJ considered whether Plaintiff has the residual functional capacity to be capable of performing her past relevant work. 20 C.F.R. 404.1520(f) and 416.920(f). When finding that a claimant can perform past relevant work, the Social Security rules require that that the decision make "the following specific findings of fact: 1. A finding of fact as to the individual's RFC; 2. A finding of fact as to the physical and mental demands of the past job/occupation; 3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation. SSR 82-62, 1982 WL 31386, at * 4 (S.S.A. 1982).

In the present case, the ALJ found Plaintiff to be limited to the RFC as stated above, which included only light work. (R. 16). Second, in determining the physical demands of past jobs, the ALJ relied on the testimony of the vocational expert, which classified Plaintiff's past work as a convenience store cashier as light exertion and past work as a data entry clerk and office manager as sedentary exertion. (R. 22). Moreover, the ALJ found that the jobs were performed within the relevant period, lasted long enough for the claimant to learn how to do

them and were performed at the substantial gainful activity level. (Id.). The ALJ further stated he followed SSR 82-62 and "carefully appraised the requirements of the claimant's former jobs and the medical evidence regarding the claimant's impairments and functional limitations and has assessed how these limitations would affect her ability to meet the requirements of her former jobs." (Id.). In doing so, the ALJ found that "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is still able to perform the past jobs." (Id.). At the administrative hearing, when given the above residual functional capacity assessment, the vocational expert testified that "such an individual could do the work as an office manager, do the work as a data entry clerk and could also – well, and the receptionist work that she did and the work as a cashier – the convenience store cashier." (R. 60). The ALJ concurred with the testimony of the vocational expert. (R. 22). Accordingly, the ALJ found that Plaintiff is capable of performing past relevant work as an office manager, data entry clerk and convenience store cashier. (Id.). Based on the ALJ's analysis and compliance with SSR 82-62, the undersigned finds that the ALJ did not err in finding Plaintiff performing past relevant work and that substantial evidence supports the ALJ's decision.

### 5. New and Material Evidence

Social Security Regulations permit a claimant to submit additional evidence when requesting review by the Appeals Council. 20 C.F.R. § 416.1470(b). The Appeals Council must consider evidence submitted with the request for review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." <u>Wilkins v. Sec'y, Dep't of Health and Human Servs.</u>, 953 F.2d 93, 96 (4th Cir. 1991) (citing <u>Williams v.</u>

<u>Sullivan</u>, 905 F.2d 214, 216 (8th Cir. 1990)); <u>see also</u> 20 C.F.R. § 404.970 (2011). Evidence is new if it is not "duplicative or cumulative." <u>Wilkins</u>, 953 F.2d at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." <u>Id.</u>

The Appeals Council "is required to consider new and material evidence relating to the period on or before the date of the ALJ decision in deciding whether to grant review." <u>Id.</u> at 95. After evaluating the record, including the newly submitted evidence, the Appeals Council will only grant the request for review "if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970 (2011). If the Appeals Council rejects the request for review, the Appeals Council is not required to explain its analysis or rationale in denying the request. <u>See</u> <u>Meyer v. Astrue</u>, 662 F.3d 700, 702 (4th Cir. 2011). The Fourth Circuit has noted that "an express analysis of the Appeals Council's determination would [be] helpful for purposes of judicial review," but such an analysis is not required. <u>Id.</u> (quoting <u>Martinez v. Barnhart</u>, 444 F.3d 1201, 1207–08 (10th Cir. 2006)). After the Appeals Council considers the new and material evidence, the evidence is incorporated into the administrative record. Thus, the reviewing court "must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings." <u>Wilkins</u>, 953 F.2d at 96.

### a.  Dr. Deputy's Letter Submitted to the Appeals Council

In the present case, the new and material evidence considered by the Appeals Council includes a letter from Plaintiff's treating physician, Dr. Glenn Deputy. (R. 733). The undersigned finds that Dr. Deputy's letter is new but not material. The evidence is new because it is not duplicative or cumulative. The letter includes Plaintiff's treating physician's opinion as to

Plaintiff's condition meeting a listing for an impairment under Section 11.00 Neurological. (Id.). Dr. Deputy's reasoning states that Plaintiff has been diagnosed with intractable generalized epilepsy, she had her first seizure in adolescence and she is on multiple medications. (Id.). Dr. Deputy further states that Plaintiff continues to experience seizures at least three times a month that she is aware of on average. (Id.). He states that she is not able to drive or maintain employment. (Id.). These opinions were not previously expressed in the record by Dr. Deputy, therefore, the evidence is new.

However, the undersigned does not find that the letter might reasonably have changed the ALJ's conclusion that Plaintiff was not disabled and is therefore, not material. The record contains treatment notes from Dr. Deputy on just two occasions, December 27, 2011 (R. 691) and February 7, 2012 (R. 688). Plaintiff told Dr. Deputy that her seizures were well controlled and that "she has only had one petit mal seizure in the last year and no grand mal seizures for several years." (R. 692). During the February appointment, Dr. Deputy opined that Plaintiff may have Meniere's disease due to Plaintiff's tinnitus and hearing loss but did not discuss at length Plaintiff's seizure disorder. (R. 688). Dr. Deputy also ordered an EEG, which was performed on February 23, 2012 and found moderately abnormal results because of "crudely sharp dysrhythmic activity in the left and right temporal regions." (R. 687).

Dr. Deputy's own treatment notes contradict his ultimate opinion in the June 25, 2012 letter. Plaintiff only reported one seizure within the past year to Dr. Deputy (R. 692) not three a month as noted by Dr. Deputy's June letter (R. 733). As such, Dr. Deputy's letter contains unsupported assertions that Plaintiff meets Listing 11.00. Dr. Deputy's own treatment notes do not support his conclusion and no additional medical records were attached to the letter

demonstrating support for his ultimate opinion. Accordingly, Dr. Deputy's letter, while new, is not material because there is no reasonable possibility that it would have changed the outcome of the ALJ's decision. See Wilkins, 953 F.2d at 96.

### b. Dr. Paul Lyons Treatment Notes Submitted to the Court

Furthermore, while Plaintiff included new medical records from Dr. Paul Lyons of Winchester Neurological Consultants, Inc. with her Motion for Summary Judgment, such records do not relate to the period on or before the date of the ALJ's decision. Evidence relates to the period on or before the date of the ALJ's decision if it provides evidence of a plaintiff's impairments at the time of the decision. See Johnson v. Barnhart, 434 F.3d 650, 655–56 (4th Cir. 2005). In the present case, the ALJ's decision is dated September 25, 2012. (R. 23). The medical records from Dr. Lyon are from 2014. (Pl.'s Mot. at 8-11). Accordingly, the records cannot be considered by the Court as new and material evidence. See Wilkins, 953 F.2d at 95-96. If Plaintiff's condition worsened after the ALJ's decision, the proper remedy is to re-apply for Social Security benefits, not to seek to overturn this ALJ's well-reasoned and detailed decision.

## VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 21) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 22) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to counsel of record and to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket sheet.

Respectfully submitted this 20th day of November, 2014.


ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE